# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

SEALED,

        Plaintiff,

v.

SEALED,

        Defendants.

FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3729 et seq.

Civil Action No.
1:19-cv-05840-SDG

## THIS DOCUMENT IS SUBJECT TO A MOTION TO SEAL:

**It should not be filed in any public format or any electronic database except by Court order**



FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 6 2020

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JOHN PETERSON,<br><br>      Plaintiff,<br><br>v.<br><br>STATE BANK FINANCIAL CORPORATION, STATE BANK & TRUST CO.; CADENCE BANCORPORATION; CENTERSTATE BANK CORPORATION; CADENCE BANK, N.A.; TIM HAZELMAN; THOMAS BIRD; DEBRA TAYLOR; LISA BRANTLEY; LISA SCHUMAN; and JOHN/JANE DOE LOAN OFFICERS 1-20,<br><br>      Defendants. | FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3729 et seq.<br><br>Civil Action No. 1:19-cv-05840-SDG |

### AMENDED QUI TAM COMPLAINT

Relator John Peterson brings this *qui tam* action in the name of the United States of America, by and through his undersigned attorneys and alleges as follows.

### INTRODUCTION

1.    This is a civil fraud action by *qui tam* Relator John Peterson ("Plaintiff-Relator" or "Relator") on behalf of the United States against Defendants State Bank

1

Financial Corporation; State Bank & Trust Co.; Cadence Bancorporation; Cadence Bank, N.A.; CenterState Bank Corporation; Tim Hazelman; Thomas Bird; Debra Taylor; Lisa Brantley; Lisa Schuman; and John/Jane Doe Loan Officers 1-20 ("Defendants") for violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as a result of their knowing presentation, or causing the presentation, of false claims for payment, retention of overpayments under government loan programs and retaliation against Relator.

2.     The Relator has evidence that State Bank, through its employees, including Hazelman, Bird, Taylor, Brantley, Schuman, and John/Jane Doe Loan Officers 1-20, personally or through their subordinates, submitted and/or caused to be submitted false claims to the United States in connection with their fraudulent mortgage practices described below. Defendants have sold tens of millions of dollars' worth of loans to the Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac") based on false certifications regarding the quality of the loans. Defendants have also originated tens of millions of mortgage loans through the U.S. Department of Housing and Urban Development ("HUD"), the U.S. Department of Veterans Affairs ("VA"), and U.S. Department of Agriculture ("USDA") mortgage programs based on false certifications regarding the quality of the loans. Upon information and

2

belief, Defendants have submitted false claims for insurance from HUD, the VA, and the USDA in connection with loans originated by Defendants based on false certifications regarding the quality of the loans.

## JURISDICTION AND VENUE

3.     This action arises under the False Claims Act, as amended, 31 U.S.C.§§ 3729-3733. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and subject matter jurisdiction under the federal False Claims Act, 31 U.S.C. § 3732.

4.     Venue lies in this district under 28 U.S.C. § 1391(b) & (c) and 31 U.S.C. § 3732(a) because the Defendants transact business and have committed acts in violation of 31 U.S.C. § 3729 in this district. State Bank maintained its headquarters in this district and Cadence Bank maintains its headquarters in this district.

## PARTIES

### A. Plaintiff/Relator

5.     Relator John Peterson is a resident of the State of Georgia. Relator Peterson was employed as a loan officer assistant in the Pooler, Georgia office of State Bank from November 15, 2017 until March 1, 2018 when he resigned rather than participate in Defendants' fraud described herein.

3

6.     Relator has an associate degree in Legal Studies from Gulf Coast State College in Panama City, Florida and studied pre-law at the University of Central Florida in Orlando, Florida. Prior to State Bank, Relator worked as a mortgage loan processor at a credit union in Panama City, Florida, where Relator received substantial training on underwriting guidelines and documentation requirements for all home equity loan products and training on compliance with mortgage lending regulations, including the Real Estate Settlement Procedures Act, ("RESPA"), the Truth in Lending Act ("TILA"), the RESPA Integrated Disclosure Rule ("TRID"), and fair lending laws.

7.     At State Bank, Relator was the loan officer assistant to Defendant Tim Hazelman, Vice President and Loan Officer. While employed as a loan officer assistant at State Bank, Relator's responsibilities included interfacing with borrowers and third-party vendors (e.g. realtors), qualifying borrowers for loans, issuing loan documents, and assisting the loan officer as needed. Relator received minimal training at State Bank regarding compliance with mortgage lending laws and regulations; rather, training focused primarily on how to complete forms. State Bank did not provide any written guidance or job aids concerning with compliance with Government Programs.

8.     Relator Peterson has independent knowledge of all the allegations against Defendants.  The Relator did not derive his allegations of wrongdoing noted below from public disclosures, but rather through his own first-hand experience working at State Bank. The Relator is the "original source" of the information on which the allegations contained herein are based, as that term is defined in 31 U.S.C. §3730(e)(4).

9.     Before filing this Complaint, Relator served the U.S. Attorney for the Northern District of Georgia and the Attorney General of the United States with a disclosure of all material evidence and information in his possession as required by 31 U.S.C. § 3730(b)(2).

10.     This action is brought by Relator in the name of the United States to recover penalties and damages arising from the false claims for payment and related false records made by Defendants and/or caused to be made by Defendants. The real party in interest to the claims set forth herein is the United States of America.

## B. Defendants

### 1) State Bank

11.     Defendant State Bank Financial Corporation was, until its acquisition by Cadence Bancorporation effective January 1, 2019, a bank holding company that

was incorporated under the laws of the State of Georgia in 2010 to serve as a holding company of State Bank and Trust Company. State Bank Financial Corporation's headquarters were located in Atlanta, Georgia. Prior to its merger with Cadence Bancorporation at the start of 2019, State Bank Financial Corporation's total assets were approximately $5 billion.

12.    Defendant State Bank and Trust Company ("State Bank") was a Georgia state-chartered bank that opened in October 2005 and grew via the acquisition of 17 banks totaling $6 billion in assets and $5.2 billion in deposits. State Bank's main office was located in Macon, Georgia. State Bank operated 32 full-service branches throughout seven of Georgia's eight largest metropolitan areas, including Atlanta, Macon/Middle Georgia, Augusta, Athens, Gainesville and Savannah.

13.    State Bank's mortgage division ("State Bank Mortgage") was based in Augusta, Georgia and had 10 mortgage offices in the following areas: Atlanta, Augusta, Macon/Middle Georgia, Savannah/Pooler, and Athens/Gainesville. State Bank Mortgage had 17 loan officers and 7 senior mortgage bankers. State Bank Mortgage offered conventional, VA, FHA and USDA Rural Development Loans. State Bank Mortgage had total volume of mortgage loans closed for 2017 of over

$506 million, of which more than $306 million was retail and nearly $200 million was wholesale.

14.    State Bank Mortgage originated approximately $500 million in residential mortgage loans per year. State Bank's SEC filings state that

> We engage in mortgage banking as part of an overall strategy to deliver fixed and variable rate residential real estate loan products to customers. ***The loans are primarily originated for sale into the secondary market with servicing released, and are approved for purchase by a third party investor prior to closing.*** We also operate wholesale lending to facilitate the purchase of loans from qualified brokers and correspondents for resale in the secondary market. We bear minimal interest rate risk on these loans and only hold the loans temporarily until documentation can be completed to finalize the sale to the investor. (emphasis added)

### 2) Cadence

15.    Defendant Cadence Bancorporation ("Cadence") is a bank holding company and a Delaware corporation headquartered in Houston, Texas. Cadence is the parent company of Cadence Bank, N.A. On May 13, 2018, Cadence announced that it would be merging with State Bank Financial Corporation. The combined organization would have $16 billion in assets, $12 billion in loans, $13 billion in deposits and approximately 100 branches serving Texas, Georgia, Florida, Alabama, Tennessee and Mississippi.

16.    Defendant Cadence Bank, N.A. ("Cadence Bank") is the bank subsidiary of Cadence. Cadence Bank's corporate headquarters were to move to

Atlanta from Birmingham and Cadence Bank CEO Sam Tortorici would relocate to Atlanta. Cadence was to remain headquartered in Houston.

17.     State Bank Financial Corporation merged with and into Cadence and State Bank merged with and into Cadence Bank effective January 1, 2019. The combined bank is the fourth largest bank in Georgia and the sixth largest bank in Atlanta.

### 3) CenterState

18.     Defendant CenterState Bank Corporation ("CenterState"), based in Winter Haven, Florida, is a Florida corporation. CenterState operates as one of the largest community bank franchises headquartered in the State of Florida. On September 24, 2018, State Bank Financial Corp. announced that CenterState acquired from State Bank the mortgage loan pipeline associated with the mortgage business, hired a team of mortgage professionals from State Bank associated with State Bank's residential lending business, and assumed certain leases where State Bank mortgage professionals have been located.

19.     Upon information and belief, the mortgage professionals from State Bank hired by CenterState continue to engage in the fraudulent practices described herein at CenterState.

8

### 4) *Individual Defendants*

20.     Defendant Tim Hazelman is a resident of the State of Georgia. Hazelman was a Vice President and Loan Officer in State Bank's Pooler, Georgia branch. Hazelman is now a loan officer with CenterState in its Pooler, Georgia branch.

21.     Hazelman was the second highest producing loan officer in State Bank's mortgage division, originating approximately $20 million in loans each year going back to at least 2015, and upon information and belief, prior to 2015. Hazelman's loan production for the years 2015-2017 and the first quarter of 2018 were as follows:

| 1) 2018 through 03/01/18 | 2) $7,528,965 |
|---|---|
| 3) 2017 | 4) $24,407,781 |
| 5) 2016 | 6) $21,482,230 |
| 7) 2015 | 8) $19,278,863 |

22.     Hazelman's profile on State Bank's website stated that he is a "VA Loan Specialist" and, Realtor estimates based on his experience as Hazelman's loan officer assistant that approximately 45-50% of all loans Hazelman originates are VA loans, 20-30% of the loans Hazelman originates are FHA loans, and the remaining loans Hazelman originates, approximately 20-35%, are sold to Fannie Mae or Freddie Mac.

9

23.     Defendant Thomas Bird ("Bird") is a resident of the State of Georgia. Bird was the CEO of State Bank Mortgage. Bird is now a First Vice President at CenterState Mortgage.

24.     Defendant Debra Taylor ("Taylor") is a resident of the State of Georgia. Taylor was a Vice President at State Bank Mortgage and managed the underwriting and retail processing departments at State Bank Mortgage.

25.     Defendant Lisa Brantley ("Brantley") is a resident of the State of Georgia. Brantley was a loan officer in the Pooler, Georgia branch of State Bank Mortgage.

26.     Defendant Lisa Schuman ("Schuman") is a resident of the State of Georgia. Schuman was the branch manager of the Pooler, Georgia branch of State Bank Mortgage.

### 5)  *John/Jane Doe Loan Officers 1-20*

27.     Defendant John/Jane Doe Loan Officers 1-20 are other loan officers who engaged in fraudulent mortgage loan practices similar to those described herein.

## FEDERAL LAWS PROHIBITING FRAUD ON THE UNITED STATES

### The False Claims Act

28.     Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the False Claims Act is the primary tool with which the

United States combats false or fraudulent claims against the Government and protects federal funds.  The Supreme Court has held that the False Claims Act's provisions must be construed broadly to reach "all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

29.   The False Claims Act provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1) (2006); 31 U.S.C. § 3729(a)(1)(A) (2010).

30.   The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B) (2010).  The prior version of the false statements provision made liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(2) (2006).

31.   The Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(A) (2010).  The

11

False Claims Act provides that no proof of specific intent to defraud is required.  31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(B) (2010).

32.    The Fraud Enforcement Recovery Act of 2009 amended the False Claims Act to define "claim" to include: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that– (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government– (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

33.    The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act. *See Neifert-White Co.*, 390 U.S. at 232.

34.     Any person who violates the False Claims Act "is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000] . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9).

## BACKGROUND OF THE GOVERNMENT MORTGAGE PROGRAMS

35.     The United States encourages home ownership through multiple government mortgage programs ("Government Programs").

### A. Fannie Mae and Freddie Mac Loan Purchase Programs

36.     The Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac") are government sponsored enterprises ("GSE") that buy mortgages from lenders and either hold these mortgages in their portfolios or package the loans into mortgage-backed securities ("MBS") that may be sold. Lenders use the cash raised by selling mortgages to the GSEs to engage in further lending. Fannie Mae and Freddie Mac were created by Congress to provide liquidity, stability and affordability to the mortgage market.

### 1) Fannie Mae and Freddie Mac Conservatorship

37.     In the years following the housing and mortgage market turmoil that began around 2007, the GSEs experienced financial difficulty. By 2008, the

13

GSEs' financial condition had weakened, generating concerns over their ability to meet their combined obligations.

38.     On July 30, 3008, pursuant to the Housing and Economic Recover Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (codified at 12 U.S.C. § 4617), Congress created the Federal Housing Finance Agency ("FHFA"), a federal agency, to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.

39.     On September 6, 2008, pursuant to HERA and in response to the insolvency of the GSEs due to mortgage defaults and delinquencies, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorships and appointed FHFA as conservator. In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs. 12 U.S.C. § 4617(b)(2).

40.     Simultaneous with the placement of Fannie Mae and Freddie Mac into conservatorship, the United States Department of the Treasure ("Treasury") exercised its authority under HERA to "purchase any obligations and other securities" issued by the GSEs and began to purchase preferred stock pursuant to the Senior Preferred Stock Purchase Agreements ("PSPAs").

41.    On September 7, 2008, following the conservatorship of Fannie Mae and Freddie Mac and Treasury's purchase of GSE preferred stock, the value of GSEs stock was eliminated.

42.    Since the conservatorship, Treasury has made quarterly capital contributions to each of the GSEs.   These federal funds have been used to purchase mortgages sold from lenders including State Bank, to cover losses from single-family mortgages purchased and guaranteed by the GSEs, and reimburse losses incurred by GSEs as a result of guaranteeing those mortgages.

### 2) GSE Rep and Warrant Model

43.    In purchasing loans for their single-family business, GSEs operate on a "rep and warrant model" relying on lenders' representations and warranties that their loans comply in all respects with the standards outlined in the GSE selling guides and lender sales contracts, which set forth underwriting, documentation, quality control, and self-reporting requirements.   Specifically, the loans sold to Fannie Mae must comply with its *Single-Family Selling Guide* (the "Selling Guide"). Loans sold to Freddie Mac must comply with its *Single-Family Seller/Servicer Guide* (the "Freddie Guide") and purchase contracts.

44.     The purchase contracts between a GSE and a lender include both a long-term master agreement that supplements the relevant selling guide and short-term contracts that grant variances or waivers from the selling guide requirements to permit a lender to sell a specific loan product. The GSEs typically renegotiate such variances on an annual basis based on the performance of the applicable loan product and other factors, and may decide to adjust the pricing on the affected loans for the following year or eliminate the variance altogether.

45.     The rep and warrant model operates on the assumption that the sellers of the loans--usually also the originators of the loan--are in a superior position of knowledge about the quality of those loans. Lenders assume certain obligations in accordance with their superior position of knowledge, such as the duty to perform prudent underwriting and quality assurance checks as required by the guidelines, and to self-report loans they identify as fraudulent, noncompliant with GSE guidelines, or otherwise materially defective. The GSEs also delegate the underwriting of the loans they purchase to the lenders. Although the GSEs reserve the right to sample a portion of the loans they purchase to ensure compliance with the guidelines, they generally conduct full file reviews only if a loan goes into default.

46.    State Bank's annual report on Form 10-K for the fiscal year ended
December 31, 2017 provides:

> Loans held-for-sale include the majority of originated residential
> mortgage loans and certain Small Business Administration ("SBA")
> loans, which the Company has the intent and ability to sell.
>
> * * *
>
> The loan sales agreements generally require that we repurchase or
> indemnify the investors for losses or costs on loans we sell under
> certain limited conditions. Some of these conditions include
> underwriting errors or omissions, fraud or material misstatements
> by the borrower in the loan application or invalid market value on
> the collateral property due to deficiencies in the appraisal.

47.    Upon information and belief, State Bank and CenterState each
entered into a Mortgage Selling and Servicing Contract (the "Master Contract")
with Fannie Mae. As set forth in that Master Contract, in sum or substance, State
Bank and CenterState as lender made several specific warranties regarding each
mortgage, including warranties that its mortgage conforms to all applicable
requirements in the Guides and the Master Agreement, and that State Bank and
CenterState know nothing involving the mortgage, the property, the mortgagor,
or the mortgagor's credit standing that can reasonably be expected to: (i) cause
private institutional  investors to regard the mortgage as an unacceptable
investment; (ii ) cause the mortgage to become delinquent; or (iii ) adversely
affect the mortgage's value or marketability.

48.    Upon information and belief, the relevant agreements expressly affirmed that State Bank's and CenterState's representations applied in their entirety to each mortgage it sold to Fannie Mae, were made as of the date transfer is made, and continued after the purchase of the mortgage.

49.    In representing to Fannie Mae that the loan sold to the GSEs is an acceptable investment, State Bank and CenterState further warranted that: (i) all required loan data is true, correct, and complete; (ii) automated underwriting conditions are met for loans processed through an automated underwriting system, and (iii ) no fraud or material misrepresentations has been committed by any party, including the borrower. These requirements were set forth in the Selling Guides and remain in effect today.

50.    State Bank and CenterState further warranted that their quality control departments takes certain post-closing measures intended to detect problems with loan manufacturing  quality, including: (i) reviewing data integrity within automated underwriting systems; (ii) re-verifying underwriting decisions and documents; (iii) re-verifying fieldwork documents (including as to appraisal and title); (iv) reviewing closing and legal documents; and (v) conducting regular reviews of internal controls relating to loan manufacturing

quality and fraud prevention. These requirements were set forth in the yearly versions of the Selling Guide.

51.     Similarly, the Freddie Guide provides that "[a]s of the Delivery Date, the Funding Date and the date of any substitution of Mortgages pursuant to the Purchase Documents, the Seller warrants and represents the following for each Mortgage purchased by Freddie Mac: (1) The terms, conditions, and requirements stated in the Purchase Documents [defined to include the guidelines and contacts] have been fully satisfied; (2) All warranties and representations of the Seller are true and correct; (3) The Seller is in compliance with its agreements contained in the Purchase Documents; [and] (4) The Seller has not misstated or omitted any material fact about the Mortgage." These representations were set forth in the yearly versions of the Freddie Guide.

52.     Upon information and belief, State Bank and CenterState entered into a Master Agreement with Freddie Mac that provides, in sum or substance, that Defendants as seller complied with all requirements of the *Freddie Mac Single-Family Seller/Servicer Guide* and the other Purchase Documents, as modified and supplemented by the terms of the Master Agreement.

53.     State Bank's and CenterState's representations that they are underwriting and delivering investment-quality mortgages according to the

GSEs' selling guides and contractual requirements were material to the GSEs' decisions to purchase mortgage loans.

54.     When a GSE identifies a material breach of a warranty, usually during a post-default quality review of a loan, it may demand that the lender repurchase the loan and/or reimburse the GSE for any loss incurred.

### B. The FHA Mortgage Insurance Program

55.     The Federal Housing Administration ("FHA"), a department of the U.S. Department of Housing and Urban Development ("HUD"), is the largest mortgage insurer in the world, insuring approximately one-third of all new residential mortgages in the United States. Pursuant to the National Housing Act of 1934, FHA offers various mortgage insurance programs. Through these programs, FHA insures approved lenders ("mortgagees") against losses on mortgage loans made to buyers of single-family housing. FHA mortgage insurance encourages lenders to make loans to creditworthy borrowers who nevertheless might not meet conventional underwriting requirements. Under HUD's mortgage insurance programs, if a homeowner defaults on a loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property. HUD also incurs expenses in managing and marketing the foreclosed-upon property until it is resold. FHA mortgage insurance

makes mortgage loans valuable in the secondary markets, as FHA loans are expected to have met HUD requirements and because they are secured by the full faith and credit of the United States.

56.     HUD's Direct Endorsement Lending program is one of the FHA-insured mortgage programs. A "Direct Endorsement Lender" is authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for HUD, and certify loans for FHA mortgage insurance without prior HUD review or approval. To qualify for FHA mortgage insurance, a mortgage must meet all of the applicable HUD requirements *(e.g.,* income, credit history, valuation of property, etc.).

57.     HUD relies on the expertise and knowledge of Direct Endorsement Lenders in providing FHA insurance and relies on their decisions. A Direct Endorsement Lender is therefore obligated to act with the utmost good faith, honesty, fairness, undivided loyalty, and fidelity in dealings with HUD. The duty of good faith also requires a Direct Endorsement Lender to make full and fair disclosures to HUD of all material facts and to take on the affirmative duty of employing reasonable care to avoid misleading HUD in all circumstances.

58.     State Bank was a Direct Endorsement Lender and, upon information and belief, CenterState is a Direct Endorsement Lender.

### *1) FHA Underwriting and Due Diligence Requirements*

59.     A Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage. The underwriter must "evaluate [each] mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d).

60.     Mortgagees must employ underwriters who can detect warning signs that may indicate irregularities, as well as detect fraud, in addition to the responsibility that underwriting decisions are performed with due diligence in a prudent manner. HUD Handbook 4000.4 REV-1, ¶ 2-4(C)(5); *see also* I-IUD Handbook 4155.2 ¶ 2.A.4.b.

61.     HUD relies on Direct Endorsement Lenders to conduct due diligence on Direct Endorsement loans. The purposes of due diligence include determining a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties. Due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral. In all cases, a Direct Endorsement Lender owes HUD the

22

duty, as prescribed by federal regulation, to exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment.

62.    HUD has set specific rules for due diligence predicated on sound underwriting principles. In particular, HUD requires Direct Endorsement Lenders to be familiar with, and to comply with, governing HUD Handbooks and Mortgagee Letters, which provide detailed processing instructions to Direct Endorsement Lenders. These materials specify the minimum due diligence with which Direct Endorsement Lenders must comply.

63.    With respect to ensuring that borrowers have sufficient credit, a Direct Endorsement Lender must comply with governing HUD Handbooks, such as HUD 4155.1, *Mortgage Credit Analysis for Mortgage Insurance on One-to-Four-Family Properties,* to evaluate a borrower's credit.  The rules set forth in HUD 4155.1 exist to ensure that a Direct Endorsement Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt.

64.    To properly evaluate a borrower's credit history, a Direct Endorsement Lender must, at a minimum, obtain and review credit histories; analyze debt obligations; reject documentation transmitted by unknown or interested parties;

inspect documents for proof of authenticity; obtain adequate explanations for collections, judgments, recent debts, and recent credit inquiries; establish income stability and make income projections; obtain explanations for gaps in employment, when required; document any gift funds; calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and consider and document any compensating factors permitting deviations from those fixed ratios.

### 2) *FHA Quality Control Requirements*

65.     Furthermore, to maintain HUD-FHA approval, a Direct Endorsement Lender must implement and maintain a quality control program. HUD requires the quality control department to be independent of mortgage origination and servicing functions. To comply with HUD's quality control requirements, a lender's quality control program must (among other things): (a) review a prescribed sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and (b) conduct a full review of all loans going into default within the first six payments, which HUD defines as "early payment defaults."

66.     In conducting a quality control review of a loan file, the lender must, among other things, review and confirm specific items of information.

67.    The HUD Handbook lays out a rating system for the quality control reviews, in which the lender implements a system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review.

68.    Under HUD's rules, a lender must report to HUD (along with the supporting documentation) "[s]erious deficiencies, patterns of non-compliance, or fraud uncovered by mortgagees" during the "normal course of business and by quality control staff during reviews/audits of FHA loans" within 60 days of the initial discovery. HUD Handbook 4060.1 REV-1, CHG-1, ¶¶ 6-13, 6-3(J); *see also* HUD Handbook 4060.1 REV-2, 7-3(J) (requiring Direct Endorsement Lenders to "immediately" report findings of "fraud or other serious violations" affecting an FHA loan); HUD Handbook 4060.1 REV-2, ¶2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices.") Upon making such findings, the lender must also expand the scope of the quality control review both by increasing the number of files reviewed and conducting a more in-depth review of the selected files.

69.    Until 2005, HUD's rules instructed Direct Endorsement Lenders to make the required self-reports of loans with serious deficiencies, patterns of noncompliance, or fraud in writing to HUD through the Quality Assurance Division of the HUD Homeownership Centers ("HOCs") having jurisdiction. In May 2005,

HUD issued Mortgagee Letter 2005-26, which notified lenders that going forward they would have to participate in electronic reporting through HUD's online Neighborhood Watch system. The new method became mandatory at the end of November 2005, and required mortgagees "to report serious deficiencies, patterns of noncompliance, or suspected fraud, to HUD in a uniform, automated fashion" and in lieu of written reports to the various HOCs.

70.   In addition to reporting loans affected by fraud or other serious violations to HUD, the lender is required to take corrective action in response to its findings. In particular, quality control review findings must be reported to the mortgagee's senior management within one month of completion of the initial report and management must take prompt action to deal appropriately with any material findings. The final report or an addendum must identify the actions being taken, the timetable for their completion, and any planned follow-up activities. Appropriate action by management includes following up with underwriters responsible for material findings to ensure that they are properly trained and diligently reviewing each file before endorsing it for FHA mortgage insurance.

### 3) FHA Direct Endorsement Lender Certifications

71.   Every Direct Endorsement Lender, including, upon information and belief, State Bank and CenterState, must make an annual certification of

compliance with the program's qualification requirements, including due diligence in underwriting and the implementation of a mandatory quality control plan (the "Annual Certification"). The Annual Certification states, in sum or substance:

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

72.    Absent a truthful Annual Certification, a lender is not entitled to maintain its direct endorsement lender status and is not entitled to endorse loans for FHA insurance.

73.    In addition to the Annual Certification requirement, after each mortgage closing, the Direct Endorsement Lender must certify that the lender conducted due diligence and/or ensured data integrity such that the endorsed mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD-92900-A.  For each loan that was underwritten with an automated underwriting system approved by FHA, the lender must additionally certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *Id.* For each loan that required

manual underwriting, the lender must additionally certify that the underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage. ..." *Id.* HUD relies on each certification to endorse the loan and provide the lender with a mortgage insurance certificate.

### C. The VA Mortgage Insurance Program

74.   The VA Home Loan Program's guaranties are issued to help eligible service members, veterans, reservists and certain unmarried surviving spouses obtain houses, condominiums, residential cooperative housing units, and manufactured homes. 38 U.S.C. §§ 3701(b)(3), 3710(a), 3712. The primary purpose of the VA Home Loan Program is to help such individuals finance the purchase of homes on more advantageous terms than typically would be available to them.

75.   The VA provides a repayment guarantee to qualified lenders equal to a specified percentage of the loan upon default of the primary debtor.  38 U.S.C §§ 3702(d), 3712(c)(2)-(3); 38 C.F.R. §§ 36.4202, 36.4225.  Only loans meeting the VA's underwriting requirements are entitled to the VA's insurance guarantee.

76.   By providing protection in the event of a default, the VA's insurance program encourages lenders to provide financing to veterans.

**D. The USDA Mortgage Insurance Program**

77.   The U.S. Department of Agriculture and Rural Development ("USDA") has a single-family residence loan guarantee program which assists approved lenders in providing low- and moderate-income households the opportunity to own adequate, modest, decent, safe and sanitary dwellings as their primary residence in eligible rural areas. The program provides a 90% loan note guarantee to approved lenders in order to reduce the risk of extending 100% loans to eligible rural homebuyers.

78.   The Rural Housing Service ("RHS") program provides mortgage insurance guarantees for loans made to qualified borrowers for housing in rural communities. *See* 7 C.F.R. § 1980.345 (applicant eligibility). The RHS partners with a broad range of eligible lenders.  When an eligible lender certifies that all program requirements have been met, delivers a completed Loan Closing Report, and pays the guarantee fee, the RHS concurrently executes a loan note guarantee. 7 C.F.R. §§ 1980.309(a) (qualification of lenders), 1980.361 (issuance of loan note guarantee).

79.   The RHS loan program is intended "to assist eligible households in obtaining adequate but modest, decent, safe, and sanitary dwellings and related facilities for their own use in rural areas." 7 C.F.R. § 1980.301(a).

80.     Like the FHA insurance program, the RHS program promotes lending to creditworthy borrowers that meet the Department of Agriculture's underwriting requirements.

81.     Relator's branch manager, Defendant Brantley, originated USDA loans. James Gay, the top originating loan officer while Relator was at State Bank, also originated USDA loans.

**E. Government Mortgage Program Standards**

82.     Government mortgage programs have strict underwriting standards in order to ensure the quality of the mortgages guaranteed and/or purchased by the government. Lenders are also required to certify the accuracy of information in residential loan applications guaranteed or insured by federal government programs before agencies will guarantee or purchase a loan.

83.     Before HUD, VA, and USDA will issue a firm commitment for mortgage insurance, lenders must certify that: (1) the information contained in the initial Uniform Residential Loan Application and the Addendum was obtained from the borrower by an employee of the lender and is to the best of the lender's knowledge complete and accurately represents the information obtained by the lender as of the date the borrower provided the information; and (2) the information contained in the final Uniform Residential Loan Application signed by the borrower

was obtained by an employee of the lender and to the best of lender's knowledge is complete and accurately represents the information obtained by the lender as of the date verified by the lender.

## F. Dodd-Frank Mortgage Reforms

84.     Lack of adherence to underwriting standards, and outright fraud in the mortgage origination and underwriting process, contributed to the bursting of the real estate bubble in 2007, triggering the most severe economic recession in the United States since the Great Depression. The material defects in the mortgage origination and underwriting process that contributed to the financial crises included failing to properly verify a borrower's employment, assets, or credit; materially overstating a borrower's income, assets, or willingness to repay the mortgage loan; materially understating a borrower's liabilities or ability to repay the mortgage loans; and failing to ensure the property provides adequate collateral for the mortgage loan. The crises was fueled, in part, but widespread predatory and fraudulent mortgage lending practices that led to massive foreclosures around the country. In the wake of the financial crises, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") to address many of the financial practices that led to the financial crises.

31

85.     Dodd-Frank mortgage reforms included requirements that: (1) lenders verify a borrower's ability to repay the mortgage; (2) borrowers document their employment and debt levels; and, (3) lenders disclose all the costs involved in each loan.

86.     Dodd-Frank requires that lenders "make[] a reasonable and good faith determination based on verified and documented information that, at the time the loan is consummated, the consumer has a reasonable ability to repay the loan" Dodd-Frank Act, Section 1411; 15 U.S.C. § 1639c(a)(1). "In order to safeguard against fraudulent reporting," income considered to determine the borrower's ability to repay a loan must be verified either by "Internal Revenue Service transcripts of tax returns;" or "(B) a method that quickly and effectively verifies income documentation by a third party subject to rules prescribed by the Board." Dodd-Frank Act, Section 1411; 15 U.S.C. § 1639c(a)(4).

## DEFENDANTS' FALSE CLAIMS PRACTICES

87.     During the course of his employment with State Bank, Relator learned of systemic violations of consumer protection laws, government loan guarantee programs, and government sponsored entity programs within State Bank's mortgage division. Relator complained to his superiors at State Bank about the mortgage division's practices and his desire not to participate in these violations. In response,

Relator was told it "is part of your job description." Relator chose to resign instead of participating in deceiving consumers and the government.

## A. State Bank Lacked Basic Policies and Practices to Prevent Mortgage Fraud by Loan Officers

88.     Mortgage loan production normally consists of four phases: origination, processing, underwriting, and closing. The loan application process is supposed to take the following course: (1) borrower completes an initial Uniform Residential Loan Application, (2) within three business days lender issues a Loan Estimate to the borrower, (3) loan processors verify information on initial Uniform Residential Loan Application from third parties, including obtaining the Request for Employment Verification directly from borrower's employer, (4) verified information is included in the final Uniform Residential Loan Application, which is then signed by the borrower, (5) lender certifies that information in application is correct. Once the loan application and documentation is complete, the loan is submitted to underwriting for approval or denial.

89.     All income and employment verifications are to be obtained by loan underwriting staff directly from borrowers. Loan origination staff are not to take part in obtaining official verifications from borrowers. The reason for this rule is that loan origination staff are incentivized to originate loans, because they are compensated on a commission basis and, therefore, are incentivized to approve

33

loans. At State Bank, loan officers were compensated based on 1-2% of the total amount of a loan. Loan underwriting staff, however, are prohibited from being incentivized to approve loans.

90.    Accordingly, lenders must have effective internal controls to avoid the possibility of fraud by origination staff. State Bank, however, lacked basic safeguards to avoid fraud by origination staff.

91.    Lack of Segregation of Duties:   Proper internal controls require segregation of duties to ensure against fraud by origination staff.  For example, origination staff should not be involved in verifying a borrower's income; rather, loan processing staff, who are not compensated on commission, should verify income. However, at State Bank, origination staff obtained verification documents prior to forwarding those documents to processing and underwriting staff, thereby, permitting origination staff to manipulate documents to ensure approval of loans by underwriters. And this is exactly what they did. According to Relator, State Bank origination staff verify borrower information so that, if there is an issue with a borrower's income, for example, origination staff can "deal with it" before it is sent to underwriting staff.

92.    Failure to Limit Capability of PDF Software: Alteration of documents is a serious risk leading to mortgage fraud. To safeguard against alteration of

documents, lenders typically limit origination staff's access to the full capabilities of PDF software (e.g. Adobe Acrobat), which permits users to manipulate PDF documents. At Relator's prior employer, for example, loan officers and assistants were not given the full version of Adobe Acrobat which would permit the user to alter PDF documents. However, State Bank provides loan officer assistants with the full version of Adobe Acrobat, thereby permitting loan officers and assistants to alter documents, including changing information on forms submitted by borrowers and third parties in PDF format. Loan officers and their assistants at State Bank change text on PDF documents and use the "paint" function to remove checkmarks from boxes. Staff also copy customer signatures from one PDF document and paste customer signatures into other PDF documents. State Bank origination staff also altered documents received from third parties, including bank statements and pay stubs.

93. <u>Failure to Utilized Document Authentication Software</u>: Lenders can also utilize document authentication software to ensure PDF documents have not been manipulated. Relator's prior employer utilized document authentication software, which allowed reviewers to see the history of PDF document, including who had edited it and what edits they had made. This ensures the authenticity of a PDF document and ensures that it has not been manipulated. State Bank does not

utilize any document authentication software for PDF documents. Accordingly, underwriters and auditors are unable to determine whether PDF documents have been manipulated.

94.    The lack of segregation of duties and lack of policies and practices to prevent fraud, and instead providing the means to alter documents (e.g. PDF software), permits State Bank loan origination staff to routinely falsify information on loan applications and forge customer signatures unchecked. Loan origination staff's fraudulent practices were so prevalent at State Bank that, as discussed in greater detail below, underwriting staff discussed it at underwriting department meetings.

95.    <u>Lack of Compliance Training</u>: State Bank's lack of proper procedures to avoid fraud is compounded by its lack of comprehensive compliance training to origination staff. As noted above, Relator's training at State Bank simply consisted of being told how to complete Government Program forms.

**B. Defendants' Fraudulent Mortgage Practices**

> ### *1) Defendants' Loan Officers and Assistants Routinely Alter Loan Application Documentation*

96.    Loan officers at State Bank, including Hazelman, routinely change data, and instruct their assistants to change data, on forms submitted by borrowers, as well as forge borrower's signatures on loan documents. Sometimes this is done

manually using "white out" and other times it is done by altering PDF documents. State Bank loan originators and assistants save customer signatures from PDF documents into a file so that they can then paste the signature onto other loan documents. State Bank origination staff also altered bank statements and pay stubs submitted by borrowers in support of their residential loan applications.

97.     When Realtor shared with loan processors the problems he was having working with Hazelman and that Hazelman had asked him to do improper things, one processor told Relator she was asked to do similarly improper things when she started at State Bank, including sign customer signatures on documents. The loan processors told Relator that Hazelman's prior assistant had quit in part for the same reason, i.e. that she was being asked to do things she did not feel comfortable doing.

98.     One loan processor was more strict in following regulatory requirements with origination staff than others and butted heads with Hazelman multiple times during Relator's time with State Bank. The loan processor explained to Relator that she had been with another bank where she had seen bad things, she had experienced the FDIC seizing assets at a prior bank where she worked, and that, as a result, she did not want to go through those things again. The loan processor had many confrontations with Hazelman, who would barge into the loan processor's office yelling if she questioned Hazelman's documentation. However, she could not

catch when documents were altered or when origination staff forged borrower signatures. Other loan processors, in Relator's observation, took a more lenient approach to verifying the accuracy of documentation received by origination staff.

99.     Examples of documents on which State Bank origination staff alter content and paste customer signatures include the Uniform Residential Loan Application, Request for Verification of Employment Form and the HUD/VA Addendum to Uniform Residential Loan Application.

### 2) Defendants Alter and Falsify Loan Applications

100.    State Bank origination staff alter information on Uniform Residential Loan Applications, including income, expenses, assets, and liabilities. For example, if a borrower checks the box indicating "yes" the borrower has declared bankruptcy within the prior seven years, State Bank changes the checked box to "no," because origination staff know that the borrower would not be approved for a loan if the "yes" box were checked.

101.    The Uniform Residential Loan Application includes a section requiring loan officers to provide information for government monitoring purposes.   The Home Mortgage Disclosure Act ("HMDA") requires lenders to collect and report certain demographic information regarding the borrower's race, ethnicity, and gender. Hazelman instructed Relator to always check the box indicating that the

borrower does not wish to provide this information. If the loan officer sees the borrower face-to-face, the loan officer is supposed to estimate the borrower's race. Hazelman instructed Relator not to do this and to still check the box indicating the borrower does not wish to provide the information. Doing so allows State Bank to avoid monitoring for discriminatory lending practices.

102.   State Bank origination staff also forged borrower signatures on loan applications, either by signing the borrower's name or copying the borrower's signature from another PDF document and pasting the customer's signatures onto applications.

### 3) Defendants Falsify Employment and Income Documentation

103.   Dodd-Frank rules require that lenders make a reasonable and good faith determination that a borrower has the ability to repay a loan and requires that lenders verify a borrower's income via a third-party source to safeguard against fraudulent reporting. *See* 15 U.S.C. § 1639c. Certain loans, e.g. loans sold to Fannie Mae and Freddie Mac, require that employment be verified in writing. This can be done through the Request for Verification of Employment form (Fannie Mae Form 1005). If a lender has proper internal controls in place, loan origination staff are not involved in verification of employment, but, rather, this is performed by loan processors and underwriting staff.  However, at State Bank this was not the case.

Indeed, Relator's job description includes that he should "review all income, check VOEs [Verification of Employment], assets, and employment information."

104.   A lender is not permitted to require a borrower to submit documents verifying employment *prior to* issuing the Loan Estimate.   *See* 12 C.F.R. § 1026.19(e)(2)(iii).   However, State Bank origination staff routinely request completed employment and income verification from borrower's employers *prior to* issuing a Loan Estimate. An example of a borrower for which Hazelman directed Relator to obtain income verification prior to providing estimated fees for a loan was a borrower named Mr. A, [1] who was applying for a VA guaranteed loan.

105.   State Bank origination staff obtain verification of employment and income prior to issuing the Loan Estimate, because, that way, if there is an issue with a borrower's income, origination staff could "deal with it" before it is sent to underwriting staff.  Indeed, State Bank loan officers routinely changed, or instructed their assistants to change, the income stated on verification forms. This was done either by using "white-out" or using the Adobe PDF software to alter verification forms.

106.   For example, a borrower, N.A., had been hired by Gulfstream in Savannah in a permanent position, but had been working for a temporary staffing

---

[1] Borrowers are referred to herein by initials to protect their identity.

agency prior to that. The underwriter on N.A's file would not approve his application because loan guidelines do not permit income from temporary work to be included in income for determining ability to pay. Defendant Taylor overwrote the underwriter's decision and was willing to make an exception to the exclusion of income from temporary work if the borrower could show continuous employment for two years. Given that the borrower was a recent immigrant, he was not able to provide verification of his foreign income. Hazelman instructed Relator to utilize a California agency that would create a verification of employment and document employment stability for a fee of $120 paid by the borrower. Relator expressed concerns to both Hazelman and his bank manager, Defendant Shuman, about what Hazelman had asked him to do. The response relator received was something to the effect of "you want to get paid, right?" This falsified employment history was submitted to the underwriter and the loan was approved. The loan was sold to Fannie Mae or Freddie Mac.

107.   Another borrower, whose name Relator does not recall, applied for loan down payment assistance through the Georgia Dream program. A loan processor told Relator that Defendant Brantley forged the borrower's signature on a credit explanation letter and created a false verification of employment. The loan processor caught the falsified documents, told Defendant Schuman about them, but nothing

happened, and Defendant Brantley was not disciplined. The loan processor processed a lot of Brantley's loan applications and told Relator about suspicious things she found in loan files, e.g. false paystubs, altered verifications of employment, and false explanation letters. Defendant Brantley was one of the top producers in the State of Georgia for the Georgia Dream program and USDA loans.

### 4) Defendants Create False Explanation Documents

108.   In the event a borrower has an issue on their application that origination staff believed would impact the borrower's ability to qualify for a loan, State Bank origination staff coach borrowers regarding what kind of explanation is necessary to ensure approval or manufacture explanation documents themselves. If loan processors or underwriters question the explanation documents, State Bank Mortgage management simply override the underwriter's decision.

109.   In addition to the example above of N.A, for whom State Bank obtained a false employment verification, another example of State Bank origination staff assisting a borrower in creating false explanation documents is that of C.B. C.B. applied for a VA insured loan that was initially denied because he had too many dependents to qualify based on his income. C.B. had four children who lived out of state with his wife and two children that lived in state with his girlfriend. His loan was initially denied because the number of dependents listed on his VA Leave

Earning Statement ("LES") did not match that on his tax returns. His LES showed that his wife and four children were dependents, whereas his tax return did not. Relator grew suspicious, because whenever C.B. called, Hazelman would go outside to speak with C.B. on his cellphone. After speaking with Hazelman, C.B. wrote a letter of explanation stating that his wife was his ex-wife and not a dependent. This was false, because C.B. and his wife were still married. The loan processor did not believe the letter of explanation and the underwriter denied the loan. When the loan was denied, Hazelman called Defendants Bird and Taylor. Defendant Taylor removed that underwriter from the file and Taylor approved the loan herself.

110.   State Bank origination staff also manufacture false documents. For example, the loan application of one applicant, G.B., was initially denied, because the borrower had filed for bankruptcy and her bankruptcy administrator had denied her request to obtain the loan. The borrower's husband had previously done a prequalification application, but never filed a full loan application. Defendants Hazelman and Schuman directed Relator to access the husband's application file and create an adverse action notice letter denying the husband's loan application. This letter was fraudulent, because the husband had never actually applied for a loan. Moreover, accessing the husband's loan file without his permission violates

43

consumer financial privacy laws. This letter was then sent to the borrower's bankruptcy administrator who then approved her to get the loan.

### 5) Defendants Manipulate Documentation of Funds to Close

111.   Lenders are also required to verify and document that the borrower has sufficient funds from an acceptable source to facilitate the closing of the loan. The source of the funds may not be the seller, someone with an interest in the transaction, or funds that must be repaid. If the cash to close comes from a bank account, lenders are required to ensure that the funds are "seasoned," i.e. that the borrower has had the funds for longer than 60-90 days. Lenders will typically request bank statements from the borrower to confirm the source and seasoning of the cash used for a down payment. If the cash is not seasoned, lenders will ask about the source of the cash to ensure that it is not a short-term loan or some other source that would indicate lack of financial stability.

112.   Hazelman routinely coaches borrowers to circumvent the sourcing requirements. To avoid having to source funds to close, Hazelman advised borrowers to put funds in a bank account and wait two months before applying for a loan. If a borrower provided bank statements that showed that the funds to close had not been in a bank account for more than 60 to 90 days, State Bank would delete from the loan file the older bank statements that showed the cash was not in the

account. When Relator became suspicious about the source of one borrower's cash to close and required documentation of the source of the funds, the borrower became angry with Relator, refused to speak with Relator, and would only speak with Hazelman.

### 6) *Defendants Falsely Certify Accuracy of Loan Applications*

113.  Once loan application data has been verified and the loan application is final, the lender must certify that the information contained in the information in the loan application is accurate by signing the VA/HUD Addendum to Uniform Residential Loan Application Certification (HUD-92900-A, VA Form 26-1802a). State Bank loan officers instructed their assistants to sign both the loan officer's signature and the borrower's signatures on the certification. The borrower's signature was often cut from another PDF document the borrower had previously signed and pasted onto the certification.

### 7) *Defendants Falsely Certify That They Have Provided Counseling to VA Loan Borrowers*

114.  VA loans require that lenders provide counseling to military homebuyers and certify that such counseling has been provided on the Counseling Checklist for Military Homebuyers. State Bank origination staff routinely signed the certification and forged customer signatures to the counseling checklist without actually providing any counseling to the borrower.  Hazelman routinely asked

45

Relator to sign both Hazelman's and the customer's signature to the VA counseling checklist.

### C. Defendants' Executive Management Routinely Overrode Underwriting Decisions

115.   State Bank Mortgage was headed by its President, Defendant Bird, who became First Vice President at CenterBank Mortgage when CenterBank took over State Bank's mortgage operations in September 2018. Defendant Taylor managed the underwriting and retail processing departments at State Bank Mortgage.

116.   Relator dealt primarily with three loan processors in State Bank's Pooler office and a few times with a loan processor in State Bank's main mortgage office in Augusta, as well as a few underwriters directly. The loan processors in the Pooler branch processed loans for all State Bank branches, not just the Pooler branch. The loan processors in the Pooler office shared with Relator the common issue of origination staff being improperly involved in the verification process and indicated to Relator that alteration of documents and signing customer signatures was widespread in State Bank's mortgage division, not just in the Pooler branch. Underwriting staff felt pressured to turn a blind eye to such actions.

117.   Most of the loan processors and underwriters took a complacent attitude towards the alteration of documents and forgery of signatures by origination staff, because the loan processors did not believe they had a choice or that there was

46

anything they could do about the issues. Loan processors were also asked to sign customer signatures themselves. When Relator spoke with or e-mailed underwriters, he was always met with the attitude of "oh, you work with Hazelman and those people," the implication being that the underwriters knew the origination staff was engaging in improper practices. In Relator's experience, State Bank's underwriting staff rarely, if ever, rejects altered documents.

118. One of the Pooler-based underwriters was stricter than the other underwriters. On occasion when that underwriter denied a loan application, loan officers would go above her head to State Bank Mortgage executive management to get the denial overridden. When a loan that Hazelman originated was denied approval by underwriting, Hazelman would call Bird, who would instruct Defendant Taylor to approve the loan. At other times, Hazelman would call Defendant Taylor directly to overrule the underwriter's decision. Taylor would then remove that underwriter from the loan file and assign another underwriter or Taylor would approve the loan herself. (*See* C.B. and N.A. loan file examples, *infra*.)

**D. Defendants Use Deceptive Bait and Switch Practices in Violation of CFPB Disclosure Rule and Conceal This Practice from Mortgage Guarantors and Purchasers**

119. Dodd-Frank created the Consumer Financial Protection Bureau ("CFPB"), whose mission includes preventing predatory mortgage lending and

making it easier for consumers to understand the terms of a mortgage before finalization. Dodd-Frank directed the CFPB to publish rules and forms that combine certain disclosures that consumers receive in connection with applying for and closing on a mortgage loan under the Real Estate Settlement Procedures Act, ("RESPA") and the Truth in Lending Act ("TILA"). Consistent with this requirement, CFPB amended RESPA and TILA regulations to establish new disclosure requirements and forms for most closed-end consumer credit transactions secured by real property called the TILA RESPA Integrated Disclosure ("TRID") rule.

120.   CFPB rules enacted pursuant to Dodd-Frank require that all lenders use the same "Loan Estimate" form with consumer borrowers to make it easier for borrowers to compare loan products. *See* 12 C.F.R. § 1024 *et seq*. The Loan Estimate combines two previously existing forms, the Good Faith Estimate and the initial Truth-in Lending disclosure, into one form. The Loan Estimate must be delivered or placed in the mail to consumers no later than the third business day after the creditor receives a loan application. *See* 12 C.F.R. § 1026.19(e)(1)(iii).

121.   State Bank failed to comply with CFPB's TRID rule requiring the use of the Loan Estimate form. Instead, State Bank used a form called an "Itemized Fee

Worksheet" to provide borrowers with an estimate of loan fees and charges. The Itemized Fee Worksheet is not approved for use with consumer borrowers.

122.   Lenders are required to make Loan Estimates in good faith and consistent with the best information reasonably available to the lender at the time they are disclosed. Generally, if the charge paid by or imposed on the consumer exceeds the amount originally disclosed on the Loan Estimate, it is not in good faith. State Bank routinely and intentionally underestimates fees and charges on the Itemized Fee Worksheet given to consumer borrowers in order to induce borrowers to use State Bank for their mortgage over other potential lenders.

123.   Relator's job included preparing Itemized Fee Worksheets for consumer borrowers. Realtor typically used an online calculator to estimate fees on the Itemized Fee Worksheet. Hazelman would tell Relator that the estimated fees Relator input were too high and that borrowers "don't want to see that amount." Hazelman would severely undercut the estimated fees to make it appear that State Bank's fees were lower than other banks in order to entice borrowers to choose State Bank for their mortgage. Hazelman told borrowers the fees quoted on the Itemized Fee Worksheet were almost certain. However, Hazelman explained to Relator, if the borrower does not know the actual fees until right before closing, the borrower is not going to switch banks at that point.

124.   State Bank did not provide borrowers with the Loan Estimate within three business days of the loan application, as required by the CFPB rules. Instead, State Bank intentionally buried the Loan Estimate in the closing documents so that the customer did not notice that the actual fees charged by State Bank and disclosed on the Loan Estimate were higher than those quoted in the Itemized Fee Worksheet. If the borrower were to notice, it would not be until they were sitting at the closing table, at which point it was too late to shop around for a new loan.

125.   On one occasion, a borrower, Mr. P, noticed the large difference in the fees originally quoted on the Itemized Fee Worksheet and those actually to be charged in the Loan Estimate. Mr. P became extremely upset at Hazelman. Hazelman went to the CEO of State Bank Mortgage division, Defendant Bird, and requested that State Bank lower the fee for Mr. P, which Mr. Bird permitted. Another example the Relator recalls in which State Bank used the Itemized Fee Worksheet was a VA loan to a borrower named Mr. A.

126.   State Bank uses the Encompass software program for digital loan origination management. All origination documents are uploaded into Encompass. Relator had a practice of uploading all documents received from or sent to borrowers into Encompass, including the Itemized Fee Worksheets. However, Relator was told by loan processors that underwriting did not want the Itemized Fee Worksheet to be

included in the loan file, because purchasers of mortgages had raised questions in the past about the Itemized Fee Worksheet. As a result, if Relator included the Itemized Fee Worksheet in the loan file, Defendant Shuman, Relator's brank manager, moved the worksheet to a trash bucket in the Encompass system. Removing the worksheet from the loan file ensured that investors, guarantors and auditors never saw the noncompliant Itemized Fee Worksheet, but, rather, only saw the compliant Loan Estimate. Accurate disclosures to borrowers regarding the costs of the loan not only protect the borrowers, but are also important to the ability to pay consideration, which is material to guarantors and purchasers of loans.

### E. Defendants Concealed the Fraud and Failed to Report the Fraud or to Take Action to Correct Fraud When Made Aware

#### 1) *Defendants Scrubbed Loan Files to Conceal Noncompliant Documents*

127.   As noted *supra,* State Bank utilized the Encompass lending platform. The loan file is kept in Encompass and used for origination, underwriting, and sale of the loans. State Bank origination and processing staff intentionally removed documents from the loan file in Encompass to conceal those documents from auditors, loan purchasers, and loan guarantors/insurers. Documents scrubbed from loan files include the noncompliant Itemized Fee and documentation such as bank statements. CFPB rules require that lenders maintain documentation of compliance

with TILA and RESPA. By removing the Itemized Fee Worksheet, State Bank concealed its failure to comply with TILA and RESPA. Relator often saved e-mails to loan files, however, these were also removed from Encompass by Hazelman and other supervisors, who told Relator the less in the file the better, because then there would be less for the purchaser of the loan to question.

### 2) Defendants' Management Is Aware of Originators' Manipulation of Borrower Data and Forgery of Borrower Signatures But Fails To Report It or Take Corrective Action

128. The improper practices of loan origination staff altering loan documents and signing customer signatures was so well known within State Bank Mortgage that the leadership of the underwriting department felt it necessary to warn underwriters and processors of the improper practices during a routine department meeting on February 14, 2018. At this meeting, underwriting staff were warned that origination staff were altering bank statements, pay stubs, and income verification forms.

129. While State Bank Mortgage management was aware of alteration of documents and forgery of borrower signatures by loan origination staff (as evidenced by the February 14, 2018 meeting and the reporting of Defendant Brantley, described *supra*), management took no action to discipline origination staff who engaged in such practices. Instead, management praised mortgage staff and

encouraged them to increase the number of loans. In a January 1, 2018 e-mail to mortgage staff, Defendant Bird discussed the need to increase efficiency and move loans through faster. He asked for "a commitment from each of you that we will 'Move Loans Forward' this year. Too many times we send a loan back a milestone when in fact the person that has the loan can make one simple change and move the loan forward."

130.   Upon information and belief, Defendants did not report fraud of which they were aware to HUD or any other Government Program, or take corrective action, as they are required to do under the Government Program rules.

### 3) *Relator Expressed Concerns About Origination Practices Up the Executive Ladder All The Way to the President of State Bank Mortgage*

131.   Relator raised concerns about loan origination practices with Hazelman, his direct supervisor, including the practice of using the improper form (the Fee Worksheet instead of the Loan Estimate) for disclosing fees; the practice of locking the interest rate without borrower confirmation; and misrepresenting loan costs and fees to borrowers at the beginning of transactions and waiting until the loan neared closing to disclose the correct amounts. Hazelman responded by stating that Relator had too much of a "compliance attitude" and needed to have more of a "sales attitude."

132.   Hazelman routinely instructed Relator to sign Hazelman's name to loan documentation and certifications. Given that Relator knew that many of the loan applications and verifications included false information, Relator was not comfortable doing so. Moreover, Hazelman was a licensed loan officer and Relator was not. Therefore, Relator also believed signing Hazelman's signature, even with his permission, amounted to forgery. A few weeks after starting at State Bank, Relator objected to Hazelman about signing Hazelman's name on loan documentation, to which Hazelman responded that another loan officer's assistant signed his name to loan documents. The other loan officer, who was based in Augusta, Georgia, was the top producing loan officer at State Bank.

133.   On February 14, 2018, Relator attended a meeting of the underwriting and processing department held via teleconference for all State Bank branches state-wide. The meeting was called by Defendant Taylor. However, Defendant Taylor was purportedly out of town for the meeting, therefore, the meeting was led by a Senior Underwriting Manager named Larry. The meeting was for underwriting staff, not origination staff. However, Defendant Taylor requested that Relator attend the meeting. The meeting was held by teleconference.

134.   During the meeting, Larry discussed the alteration of documents by loan origination staff and the signing of customer signatures on loan documents by

origination staff. Larry mentioned that loan origination staff altered loan application forms and supporting documents, including tax returns and bank statements. Larry joked that, if you are going to alter a bank statement, at least update the page numbers and totals on the statement. Larry stated that, while we would like to trust the people we work with, we can't take what they give us at face value.

135.   On February 14, 2018, after the underwriting-processing meeting during which alteration of loan documents was discussed, Relator went to Hazelman's direct supervisor, Defendant Shuman, and raised concern about signing loan documents for Hazelman, the use of noncompliant fee disclosure forms, the alteration of loan documents and signing customer signatures. Defendant Shulman, who supervised all the loan officers in the Pooler branch and originated loans herself, was aware of these improper practices, and herself removed documents from Encompass and pushed for loans to close. Defendant Schuman told Realtor that this was the way they had always done things and that Hazelman's prior loan assistant had signed on behalf of Hazelman.

136.   Relator asked top performing loan officer's assistant (mentioned above) whether she signed the loan officer's name to loan documents. She responded, "Being an LOA [loan officer assistant] I do not sign my name on anything." Relator informed Hazelman and Shuman of the assistant's response. Hazelman replied that

he did not believe this, knew that the assistant signed for the top performing loan officer, that Hazelman's prior assistnat always did it that way, and that it would slow them down when things got busy if Hazelman had to sign loan documents himself. Relator expressed to Defendant Shuman that he remained uncomfortable signing loan documents on behalf of his loan officer and that he would reach out to executive management about his concerns.

137.   Relator e-mailed Renee Douglas, Executive Operations Manager for State Bank Mortgage, on February 14, 2018, noting the discussion of "altered documents, signatures, etc." at the underwriting-processing meeting that day, and stating that he had "a few questions regarding signing on behalf of LO's [loan officers'] we assist," including the "VA Counseling Checklist, HUD Addendums, Record Verbal Authorizations to pull credit, etc." Ms. Douglas responded, on February 16, 2018, that State Bank's current processes do not allow loan assistants to sign on behalf of loan officers, but that she understood it would be more efficient and she would look into investor guidelines.

138.   Relator shared with Defendant Shuman, that Ms. Douglas had indicated that the current process did not allow loan assistants to sign on behalf of loan officers. Defendant Shuman responded to Realtor that she disagreed and that she would speak with Defendant Bird at an upcoming meeting for her annual

performance review. Defendant Shulman indicated that she would discuss with Defendant Bird all of Relator's concerns (i.e. whether loan assistants should sign loan officer's names to loan documents, the use of noncompliant consumer fee disclosure forms, the alteration of documents, and the signing of customer signatures by staff).

139.   On February 23, 2018, Relator sent an e-mail to a State Bank Mortgage Help e-mail group, summarizing his concerns with the use of the Itemized Fee Worksheet and with requesting income verification documents before issuance of a Loan Estimate. Relator forwarded a copy of his e-mail to Ms. Douglas.

140.   On February 28, 2018, Relator spoke with Ms. Douglas by telephone and Douglas clarified that Relator should not sign on behalf of loan officers and should not provide borrowers with loan documents that were not compliant with CFBP rules. Relator sent an e-mail to Ms. Douglas confirming their conversation. Relator also e-mailed Hazelman informing him that Relator had spoken with Ms. Douglas, that they could not send the Itemized Fee Worksheet to borrowers, because it was not compliant with CFBP TRID rule, and that they must send the Loan Estimate. Hazelman responded that he had been "doing this for years" and Relator needed to send out the Itemized Fee Worksheet. When Relator replied that he would

not go against regulations, Hazelman responded that he did not care and Relator should send the Itemized Fee Worksheet immediately.

141.   As a result of Relator's questioning and reporting the fraudulent mortgage practices described herein, Relator was subjected to intimidation, ridicule, and interference with his work performance.

142.   On March 1, 2018, Shuman informed Relator that, based on her meeting with Defendant Bird, Relator would need to sign loan officer's loan documents to "speed up the process" and that Defendant Bird had indicated "everybody does it" and "the other loan officer assistants all do it for their loan officers." Defendant Shuman did not mention Relator's other concerns, i.e. noncompliant consumer fee disclosure forms, alteration of loan documents, and staff signing customer signatures. Relator objected and Defendant Shuman indicated that, based on her meeting with Bird, it was "in your job description as a loan officer assistant" to do the things to which Relator objected. Relator responded that committing mortgage fraud was not listed in his job description. Later that day, Relator tendered his resignation.

## COUNT I

***For Damages and Penalties for Presenting or
Causing to be Presented False Claims Under
31 U.S.C. § 3729(a)(1)(A) of the False Claims Act***

58

143.   Plaintiff repeats and realleges the allegations above as if fully set forth herein.

144.   As set forth above, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made false representations about the quality of their loans at the time of their sale to or insurance by the Government Programs, including that the loans were of investment quality and complied with the Government Program guidelines, selling guides, and purchase contracts.

145.   Defendants' misrepresentations about loan quality were capable of influencing, and thus material to, the Government Programs' decisions about purchasing or insuring such loans.

146.   The Government Programs have incurred losses as a result of Defendants' misrepresentations in the form of paying to purchase the loans or paying guarantees to third parties after the affected loans defaulted.

147.   Treasury funds have been used to purchase or insure Defendants' loans and to reimburse the losses incurred by the Government Programs as a result of paying either insurance or guarantees to third parties after the loans purchased or insured from the Defendants defaulted.

148. Treasury funds have been used to purchase or insure Defendants' loans and to reimburse the losses incurred by the Government Programs as a result of paying either insurance or guarantees to third parties after the loans purchased or insured from the Defendants defaulted.

149. Treasury funds to the Government Programs were used to "advance a Government program or interest," within the meaning of 31 U.S.C. § 3729(b)(2), specifically, to prevent disruptions in the residential mortgage market.

150. By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(A), for each of the loans sold to the Government Programs in violation of the Government Program requirements, Defendants knowingly, or acting in deliberate ignorance and/or in reckless disregard of the truth, presented a fraudulent claim for payment or approval.

151. Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendants are liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,000 and not more than $10,000 for each of the false or fraudulent claims herein, plus three (3) times the amount of damages which the Government Programs have sustained because of Defendants' actions.

## COUNT II

### *For Damages and Penalties for Making or Using False Statements or Records Material to a False Claim Under 31 U.S.C. § 3729(a)(1)(B) of the False Claims Act*

152.   Plaintiff repeats and realleges the allegations above as if fully set forth herein.

153.   As set forth above, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made false representations about the  quality of their loans at the time of their sale to or insurance by the Government Programs, including that the loans were of investment quality and complied with the Government Program guidelines, selling guides, and purchase contracts.

154.   Defendants' misrepresentations about loan quality were capable of influencing, and thus material to, the Government Programs' decisions about purchasing or insuring such loans.

155.   The Government Programs have incurred losses as a result of Defendants' misrepresentations in the form of paying guarantees to third parties after the affected loans defaulted.

156.   Treasury funds have been used to purchase or insure Defendants' loans and to reimburse the losses incurred by the Government Programs as a result of

paying either insurance or guarantees to third parties after the loans purchased or insured from the Defendants defaulted.

157.   Treasury funds to the Government Programs were used to "advance a Government program or interest," within the meaning of 31 U.S.C. § 3729(b)(2), specifically, to prevent disruptions in the residential mortgage market.

158.   By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(B), for each of the loans sold to the Government Programs in violation of the Government Program requirements, Defendants knowingly, or acting in deliberate ignorance and/or in reckless disregard of the truth, presented a fraudulent claim for payment or approval.

159.   Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendants are liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,000 and not more than $10,000 for each of the false or fraudulent claims herein, plus three (3) times the amount of damages which the Government Programs have sustained because of Defendants' actions.

## COUNT III

### For Damages and Penalties for False Claims Conspiracy
### Under 31 U.S.C. § 3729(a)(1)(C) of the False Claims Act

160.   Plaintiff repeats and realleges the allegations above as if fully set forth herein.

161.   Defendants entered into a conspiracy or conspiracies to defraud the United States as described herein.

162.   By virtue of the false records or false statements caused to be made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of $5,000 to $10,000 for each violation.

## COUNT IV

*For Damages and Penalties for "Reverse False Claims"*
*for Making or Causing to be Made False Records to Avoid an Obligation*
*to Refund in Violation of 31 U.S.C. § 3729(a)(1)(G) of the False Claims Act*

163.   Plaintiff repeats and realleges the allegations above as if fully set forth herein.

164.   Defendants were made aware of the wrongdoing alleged herein, at the latest, when Plaintiff-Relator reported the wrongdoing to supervisors who reported the wrongdoing up the supervisory chain, including to the head of State Bank's mortgage division. Through an exercise of due diligence Defendants should have identified overpayments from the Government Programs, including the sale of mortgages to the GSEs that did not meet standards set forth in GSE selling guides and lender sales contracts, including underwriting, documentation, quality control, and self-reporting requirements.

165.   Defendants knowingly caused to be made or used false records or false statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States and knowingly concealed and improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

166.   By virtue of the false records or false statements caused to be made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of $5,000 to $10,000 for each violation.

## COUNT V

### *Wrongful and Retaliatory Termination of Relator in Violation of 31 U.S.C. § 3730(h) of the False Claims Act*

167.   Plaintiff repeats and realleges the allegations above as if fully set forth herein.

168.   The False Claims Act entitles employees "all relief necessary to make that employee … whole" if she is terminated "or in any other manner discriminated against in the terms and condition of employment because of lawful acts done by the employee … to stop one or more violations of the FCA." 31 U.S.C. § 3730(h)(1).

169.   An employee so wronged may also be reinstated with equal status and may recover double back pay with interest "and compensation for any special

damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." *Id.* § 3730(h)(2).

170.   Relator engaged in protected activity by, *inter alia*, specifically reporting Defendants' fraudulent activities to his supervisors in an attempt to stop the violations described above and objecting to participating in the violations.

171.   After Relator began reporting his concerns about the mortgage practices, Defendants subjected Relator to a hostile work environment due to his protected activity; this discrimination included but was not limited to disparate work conditions not imposed upon employees who acquiesced in Defendant's frauds, harassment, increased discipline and reports thereof, and threats to Relator's employment.

172.   Moreover, Defendant constructively discharged Relator after he complained about the improper mortgage practices and refused to participate in said practices.

173.   Because of Defendant's unlawful retaliation against him, Relator has suffered a loss of employment opportunities and earnings and a loss of future earnings and earning capacity, and Relator has suffered and continues to suffer non-monetary damages including but not limited to emotional and physical distress, humiliation, embarrassment, loss of esteem and loss of enjoyment of life.

## JURY TRIAL

174.   Relator hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of himself and the United States Government, requests the following relief:

1. A judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' violations of the False Claims Act;

2. A judgment against Defendants for a civil penalty of $10,000 for each of Defendants' violations of the False Claims Act;

3. That in the event the United States Government proceeds with this action, Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

4. That in the event the United States Government does not proceed with this action, Relator be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

5. That Relator be awarded double back pay with interest and compensation for any special damages sustained as a result of his wrongful constructive termination;

6.  That Relator recover all costs of this action, with interest, including the cost
to the United States Government for its expenses related to this action;

7.  That Relator be awarded all reasonable attorneys' fees in bringing this action;

8.  That a trial by jury be held on all issues so triable;

9.  An award of pre-judgment interest; and

10. Such other relief to Relator and/or the United States of America as this Court
may deem just and proper.

Dated: October 6, 2020

                                        Respectfully submitted,

                                        s/ Kristi Stahnke McGregor
                                        Kristi Stahnke McGregor
                                        Georgia Bar No. 674012
                                        James M. Evangelista
                                        Georgia Bar No.  707807
                                        David J. Worley
                                        Georgia Bar No. 776665
                                        **EVANGELISTA WORLEY, LLC**
                                        500 Sugar Mill Rd.
                                        Bldg. A, Suite 245
                                        Atlanta, GA 30350
                                        Tel: (404) 205-8400
                                        Fax: (404) 205-8395
                                        kristi@ewlawllc.com
                                        jim@ewlawllc.com
                                        david@ewlawllc.com

Zahra S. Karinshak
Georgia Bar No. 407911
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 West Peachtree St., NW
Suite 3250
Atlanta, GA 30309
Tel: (404) 888-9700
karinshak@khlawfirm.com

***Counsel for Relator***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Amended Qui*

*Tam Complaint* was served on the following on the date and manner listed below:


*Via E-mail:*

Paris Wynn, Esq.
U.S. Attorney's Office NDGA
75 Ted Turner Dr., Ste. 600
Atlanta, GA 30303
paris.wynn@usdoj.gov

John W. Black, Esq.
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
john.w.black@usdoj.gov


This 6th day of October 2020.


<u>s/ Kristi Stahnke McGregor</u>
Kristi Stahnke McGregor

69